Filed 2/11/15  In re A.M. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | B258039 (Los Angeles County Super. Ct. No. CK92744) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. V.G. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Conditionally reversed and remanded with directions.

David A. Hamilton, under appointment by the Court of Appeal, for Defendant and Appellant V.G.

Law Office of Marissa Coffey, Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Tarkian & Associates, Arezoo Pichvai for Plaintiff and Respondent.

## INTRODUCTION

The Los Angeles County Department of Children and Family Services (Department) filed a petition under Welfare and Institutions Code section 300[1] alleging that now five-year-old F.M., now nine-year-old H.M., and now 17-year-old A.M. came within the jurisdiction of the juvenile court. As ultimately sustained, the section 300 petition alleged under subdivisions (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of a sibling) that H.M.'s father, V.G., sexually molested H.M. On appeal from the juvenile court's order terminating her parental rights to F.M. and H.M. and its order appointing legal guardians for A.M. pursuant to section 366.26, D.M. (mother) contends that because the Department failed to comply with the notice provisions of the Indian Child Welfare Act (ICWA or Act) (25 U.S.C. § 1901, et seq.), the juvenile court erred in finding that the ICWA did not apply.[2] With respect only to H.M., father joins mother's appeal and also contends that the juvenile court erred in finding that the beneficial parental relationship exception to the termination of parental rights in section 366.26, subdivision (c)(1)(B)(i) (section 366.26(c)(1)(B)(i)) did not apply. Because the Department did not comply with the ICWA's notice provisions, we conditionally reverse the order terminating mother's parental rights to F.M. and H.M., the order appointing legal guardians for A.M., and the order terminating father's parental rights to H.M. and remand this case with directions to the juvenile court to ensure full compliance with the ICWA.

---

[1]     All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

[2]     This appeal does not concern the section 300 petition the juvenile court sustained with respect to mother's son, J.M., who was born during the pendency of this matter.

# BACKGROUND[3]

On March 27, 2012, the Department filed its section 300 petition alleging that F.M., H.M., and A.M. came within the jurisdiction of the juvenile court. Also on March 27, 2012, mother filed a Parental Notification of Indian Status form stating that she might have Indian ancestry and identifying the "Creek and Artikee" tribes. Father also filed a Parental Notification of Indian Status form stating that he had no Indian ancestry. At the detention hearing, the juvenile court ordered that father could have monitored visits with H.M. three times a week for three hours. The juvenile court permitted H.M. to refuse visits with father.

At the June 1, 2012, jurisdiction/disposition hearing, the juvenile court sustained the section 300 petition as follows: "On prior occasions in 2011, six year old [H.M.]'s father, [V.G.] sexually abused the child by fondling the child's vagina. The child is afraid of the father and does not wish to reside with the father due to the father's sexual abuse of the child. The child's mother, [D.M.], knew of the sexual abuse of the child by the father and failed to protect the child. Such sexual abuse of the child by the father and the mother's failure to protect the child endangers the child's physical health and safety and places the child and the child's siblings, [A.M.] and [F.M.], at risk of physical harm, damage, danger, sexual abuse and failure to protect." Father's visitation order remained the same—monitored visits with H.M. three times a week for three hours. The juvenile court ordered the Department to address the ICWA issue in its section 366.21, subdivision (e) report.

On September 13, 2012, F.M., H.M., and A.M. were placed with Nancy and Mel G. The social worker reported that the children appeared to be happy and to have a positive relationship with their foster parents.

On May 7, 2013, the Department filed a subsequent petition pursuant to section 342. As ultimately sustained, the section 342 petition alleged under subdivisions (b), (d),

---

**3**    Because mother appeals only from the claimed failure to comply with the ICWA, we limit our recitation of facts concerning mother to that issue except as otherwise necessary for context.

and (j) that "[t]he children [A.M.], [H.M.], and [F.M.]'s mother, [D.M.]'s, male companion, [V.G.], sexually abused the child, [A.M.], by fondling the child's body. Such sexual abuse of the child by the mother's male companion endangers the child's physical health, safety placing the child and the child's siblings, [H.M.] and [F.M.] at risk of physical harm, damage and sexual abuse." As sustained, the petition further alleged under subdivisions (b) and (j) that "[o]n a prior occasion, [A.M.], [H.M.], [F.M.]'s mother, [D.M.] placed the child, [A.M.] in a detrimental and endangering situation by giving the child alcohol to drink. Such a detrimental and endangering situation established for the child by the mother endangers the child's physical health and safety, placing the child and the child's siblings, [H.M.] and [F.M.], at risk of physical harm, damage and danger."

At the November 13, 2013, 18-month permanency planning review hearing, the juvenile court found a substantial risk of detriment to the children if returned to their parents. The juvenile court terminated family reunification services for mother and father and set the matter for a section 366.26 hearing on March 12, 2014. Father's visits with H.M. were reduced to monitored visits two times a month for three hours.

The June 11, 2014, section 366.26 report stated that the G.'s were committed to providing F.M. and H.M. with a loving, stable, and secure home. F.M. and H.M. had made positive progress in their placement with the G.'s and were affectionate and engaged appropriately with their prospective adoptive parents.

At the section 366.26 hearing, the juvenile court found that F.M. and H.M. were adoptable. The juvenile court stated, with respect to F.M. and H.M., "They were placed with the [G.] family nearly two years ago. And those people have been acting as the parents day in day out every day, every night, every weekend, holidays. They've been doing the job of the parents. These children know this family as their parents." The juvenile court found that any bond that existed between father and H.M. was not sufficiently strong that it would overcome the benefits to H.M. of being adopted. The juvenile court appointed the G.'s as A.M.'s guardians, terminated mother's parental rights to F.M. and H.M., and terminated father's parental rights to H.M.

4

**DISCUSSION**

**I.     The Juvenile Court Properly Found That the Section 366.26(c)(1)(B)(i) Beneficial Parental Relationship Exception to the Termination of Parental Rights Did Not Apply**

Father contends that the juvenile court erred in finding that the beneficial parental relationship exception to the termination of parental rights in section 366.26(c)(1)(B)(i) did not apply.  The juvenile court did not err.

*A.     Background*

The November 6, 2012, Status Review Report reported father's visit with H.M. on October 19, 2012, at a park.  H.M.'s caregiver monitored the visit and reported that father and H.M. were excited to see each other.  Father appeared to interact appropriately with H.M. during the visit.

The May 7, 2013, Status Review Report stated that father visited H.M. every week at a park or a church.  The visits usually lasted three hours.  Mr. G. reported that father loved to see H.M.  H.M enjoyed being with her father and ran to him and gave him a hug.

In the June 18, 2013, Interim Review Report, the social worker reported that father visited H.M. twice a week at a park.  Mr. G. monitored the visits.  Father and H.M. were happy to see each other and spent a lot of time discussing H.M.'s daily activities.  Father and H.M. also participated in activities such as riding bicycles and scooters.

In the September 27, 2013, Status Review Report, the social worker reported that it had been difficult for the caregiver and father to schedule visits with H.M. as father worked during the day and H.M. attended school and therapy.  Mr. G. had been monitoring father's visits.  Father usually visited H.M. for three hours a week, but sometimes visited less depending on his work schedule.  According to Mr. G., father loved to see H.M. and H.M. ran to father hugged him.  H.M. reportedly enjoyed being with father.  Father had no visits in July 2013, and two visits in August 2013 that lasted about an hour and a half.

In early September 2013, Mr. G. reported that father visited H.M. for three hours weekly at a local park. After Mr. G. notified H.M.'s therapist that during visits that father placed H.M. on his back to sit on his shoulders and held her legs tightly, the monitored visits were changed to the Department's office. Because Mr. G. was no longer comfortable monitoring the visits, the social worker became the monitor.

At the November 13, 2013, 18-month review hearing, the juvenile court terminated family reunification services for mother and father as to F.M., H.M., and A.M. The juvenile court ordered that father was to have three-hour visits two times a month.

The March 12, 2014, section 366.26 report stated that father visited H.M. two times a month, consistently. Father refused to sign a visitation contract that stated that he was not to touch H.M. inappropriately. Mr. and Mrs. G. expressed a strong desire to adopt F.M. and H.M. F.M. and H.M. appeared to be happy, well adjusted, and well cared for in their placement. Mr. and Mrs. G. appeared to be meeting all of F.M. and H.M.'s medical, emotional, and physical needs.

The March 12, 2014, Status Review Report stated that during a January 10, 2014, visit the social worker reviewed visitation guidelines with father—because the case involved sexual abuse, father was to have no physical contact with H.M. Father said, "that is not going to happen," and refused to sign the guidelines. During the visit, father and H.M. talked about school, and she read to him for 20 minutes.

During a visit on February 25, 2014, father patted H.M.'s head a couple of times. The social worker monitoring the visit told father that it was not appropriate for him to touch H.M. Father appeared to be upset and said, "This is bull." The social worker told father to "stop saying that," and if he continued, she would end the visit. Father responded, "I still have time to visit with my daughter."

A Last Minute Information for the Court stated that between November 13, 2013, and June 4, 2014, father visited H.M. twice a month for three hours. Father arrived on time, and H.M. appeared to be happy to see father. During visits, father sometimes helped H.M. with homework and played catch with her. The social worker who monitored the visits observed that, over time, H.M. had become more comfortable when

6

father tried to touch or hug her.  On December 22, 2013, father attended a church Christmas play in which H.M. participated.

At the section 366.26 hearing, the parties stipulated that if called to testify, father would testify that he visited H.M. twice a month at the time of the hearing.

### B.     Standard of Review

Whether the beneficial parental relationship exception to adoption "applies involves two component determinations:  a factual and a discretionary one.  The first determination— . . . whether a beneficial parental . . . relationship exists . . .—is, because of its factual nature, properly reviewed for substantial evidence.  ([*In re Bailey J.* (2010) 189 Cal.App.4th 1308,] 1314.)  The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.'  (§ 366.26, subd. (c)(1)(B); *Bailey J.,* at p. 1315.)  This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard.  (*Bailey J.,* at p. 1315.)"  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

### C.     Application of Relevant Principles

Once a juvenile court finds that a child is likely to be adopted after removing the child from parental custody and has terminated reunification services, parental rights may be terminated unless the court finds a compelling reason for determining that doing so would be detrimental to the child under certain exceptions set forth in section 366.26, subsection (c)(1).  (*In re Celine R.* (2003) 31 Cal.4th 45, 52-54.)  These "exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption."  (*Id.* at p. 53; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 ["Because a section 366.26 hearing occurs only after the court

7

has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement"].)

The beneficial parental relationship exception in section 366.26(c)(1)(B)(i) provides that parental rights will not be terminated and a child freed for adoption if the parent has "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." Application of the beneficial parental relationship exception consists of a two-prong analysis. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449-450.) The first is whether there has been regular visitation and contact between the parent and child. (*Id.* at p. 450.) The second is whether there is a sufficiently strong bond between the parent and child that the child would suffer detriment from its termination. (*Ibid.*)

The parent/child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

The beneficial parental relationship exception does not apply when a parent fails to occupy a parental role in his or her child's life. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) To establish the beneficial parental relationship exception, "the parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.]" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) A relationship sufficient to support the beneficial parental

8

relationship exception "aris[es] from day-to-day interaction, companionship and shared experiences." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Whether the exception applies is determined "on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) A parent must show that he or she has maintained regular visitation and contact with the child and that a benefit to the child would result from continuing the relationship. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 821; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.)

The juvenile court properly found that the beneficial parental relationship exception to the termination of parental rights did not apply. Although father met the first prong of the exception by showing that he had regular visitation with H.M., he did not meet the second prong by showing that the benefit H.M. received from her relationship with father outweighed the benefit she would receive from adoption by the G.'s.

As to the second prong, the record shows that father loved H.M. and H.M. enjoyed visiting with father. During some of those visits, however, father initiated physical contact with H.M.—having her sit on his shoulders and holding her legs tight on one occasion and patting her on the head on another—that the visit monitors thought was inappropriate. Father also failed to show that he occupied a parental role in H.M.'s life. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350; *In re Beatrice M., supra,* 29 Cal.App.4th at pp. 1418-1419.) At the time of the section 366.26 hearing, father was visiting H.M. only twice a month for a total of six hours. At the same time, H.M. was doing well in her placement with the G.'s, having lived with them for nearly two years. The G.'s were committed to providing H.M. and her siblings with a loving, stable, and secure home. H.M. had made positive progress in her placement with the G.'s and was affectionate and engaged appropriately with the G.'s. Thus, although there was evidence

9

that father and H.M. had a positive relationship, father failed to show that termination of his parental rights would cause H.M. great harm. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Accordingly, father did not show that exceptional circumstances existed to justify the juvenile court choosing an option other than adoption and the juvenile court did not err in finding that the beneficial parental relationship exception did not apply. (*In re Celine R., supra,* 31 Cal.4th at p. 53; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350 [it is only in an extraordinary case that the preservation of a parent's rights will prevail over the preference for adoption].)

## II.     ICWA Compliance

Mother, joined by father, contends that the juvenile court erred when it found that the ICWA did not apply. The Department agrees as do we.

### A.     Background

On March 27, 2012, mother filed the Parental Notification of Indian Status form that stated that she might have Indian ancestry in the "Creek and Artikee" tribes. On May 7, 2012, mother provided the social worker with information about mother's Indian ancestry. On May 8, 2012, the social worker mailed notices, certified return receipt requested, to the Cherokee Nation of Oklahoma, Eastern Band of Cherokee, United Keetoowah, Alabama Quassarte Tribal Town, The Muscogee (Creek) Nation, Kialegoo Tribal Town, Thlopthlocco Tribal Town, Poarch Band of Creek Indians, the Secretary of the Interior, and the area director of the Bureau of Indian Affairs (BIA). In the notices, the social worker stated that mother said her mother and grandmother told her that she had Cherokee or Creek Indian heritage. The social worker provided maternal grandmother's name, birth date, place of birth, and address; and maternal great grandmother's name, date of death, and place of death. The social worker stated that the maternal great grandmother's date and place of birth were unknown. The social worker received return receipts from each of the Indian tribes, the Secretary of the Interior, and the director of the BIA.

10

The Poarch Band of Creek Indians wrote to the social worker that a search of their records revealed that F.M., H.M., and A.M. were not enrolled or eligible to enroll in their tribe. The United Keetoowah Band of Cherokee Indians in Oklahoma wrote to the social worker stating that it had searched its enrollment records based on the information the social worker supplied and that there was no evidence that the children were descendents of anyone in their tribe. The Alabama Quassarte Tribal Town wrote to the social worker stating that the children were not members or eligible for membership in their tribe. The Cherokee Boys Club, Inc. informed the social worker by letter that it had reviewed the Eastern Band of Cherokee Indians' tribal registry based on the information the social worker provided and determined that the children were not registered or eligible to register in the tribe.

The social worker attached to the Department's May 7, 2013, Status Review Report a letter from the Cherokee Nation dated June 29, 2012, in which the tribe stated that it had previously sent a letter to the social worker concerning her inquiry about the children's tribal eligibility. The June 29, 2012, letter stated that the tribe had requested additional information in the prior letter, that it sent the prior letter over 30 days earlier, and that it had not received a response. The June 29, 2012, letter asked for the maternal great grandmother's date of birth or a response stating that the social worker did not have that information. The social worker also attached to the May 7, 2013, Status Review Report a letter from the Cherokee Nation dated July 30, 2012, in which the tribe stated that it had sent the social worker its first request for additional information over 60 days earlier and its second request for information over 30 days earlier. Having not received a response from the social worker, the tribe was closing the social worker's inquiry about the children's tribal eligibility. At the May 7, 2013, hearing, the juvenile court found that mother and father were not members of any Indian tribe.

In the Department's June 18, 2013, Jurisdiction/Disposition Report concerning the section 342 petition, the social worker noted mother's claim to Cherokee and Creek Indian heritage on her mother's side of the family and Indian heritage based on an unknown tribe on her father's side. The social worker detailed previous efforts to

11

determine mother's Indian heritage, if any. On February 26, 2013, the social worker left a message with a paternal aunt who did not return the message. The same day, the social worker contacted a maternal aunt and maternal grandmother who were able to provide additional information concerning maternal great grandmother, such as her date of birth—i.e., information the Cherokee Nation had requested.

On February 27, 2013, the social worker mailed ICWA notices to the Cherokee and Creek tribes regarding J.M. The social worker also "resubmitted" ICWA notices as to F.M., H.M., and A.M. According to the social worker, she had submitted to the juvenile court the return receipts for and response letters to the resubmitted ICWA notices prior to the Department's June 18, 2013, Jurisdiction/Disposition Report.[4] The social worker stated that the Department received a letter from the Cherokee Nation dated March 22, 2013, indicating that F.M., H.M., and A.M. would "not be considered an 'Indian child/children' in relationship to the Cherokee Nation." At the June 18, 2013, jurisdiction/disposition hearing, the juvenile court found that the ICWA did not apply because there was no reason to know that F.M., H.M., and A.M. were Indian children.

### B. *Application of Relevant Principles*

"In 1978, Congress passed the Act, which is designed to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.'" (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 734, quoting 25 U.S.C. § 1902.) The Act "sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody. When the dependency court has reason to believe a

---

**4** The Department acknowledges that the ICWA notices that were resubmitted to the Cherokee and Creek tribes, the Secretary of the Interior, and the BIA are not part of the record on appeal.

12

child is an Indian child within the meaning of the Act, notice on a prescribed form must be given to the proper tribe or to the Bureau of Indian Affairs, and the notice must be sent by registered mail, return receipt requested. [Citations.]" (*In re Elizabeth W.* (2004) 120 Cal.App.4th 900, 906.)

"When a court 'knows or has reason to know that an Indian child is involved' in a juvenile dependency proceeding, a duty arises under ICWA to give the Indian child's tribe notice of the pending proceedings and its right to intervene. [Citations.]" (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538.) "ICWA notice requirements are strictly construed. [Citation.] The notice sent to the BIA and/or Indian tribes must contain enough information to be meaningful. [Citation.] The notice must include: if known, (1) the Indian child's name, birthplace, and birth date; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the child's parents, grandparents, great grandparents, and other identifying information; and (4) a copy of the dependency petition. [Citation.] To enable the juvenile court to review whether sufficient information was supplied, [the child dependency] [a]gency must file with the court the ICWA notice, return receipts and responses received from the BIA and tribes. [Citation.]" (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.)

The Department concedes that it did not comply with the ICWA notice provisions and suggests a limited reversal for ICWA compliance. The Department states, "the record on appeal does not contain any of the ICWA notices that had been resubmitted to the Creek and Cherokee tribes, the Secretary of the Interior, and the Bureau of Indian Affairs with the updated information on the maternal great grandmother. Therefore, [the Department] does not oppose a limited reversal of the termination of the mother and father's parental rights and remand to procure proper notice to any appropriate tribes. If no tribe deems the children Indian, the juvenile court shall reinstate the order terminating parental rights." The return receipts for and response letters to the resubmitted ICWA notices that the social worker stated she had submitted to the juvenile court also are not a part of the record on appeal. Because the Department did not comply with the ICWA's notice provisions (*In re Francisco W., supra,* 139 Cal.App.4th at p. 703), we

13

conditionally reverse the order terminating mother's parental rights to F.M. and H.M., the order appointing legal guardians for A.M., and the order terminating father's parental rights to H.M. and remand this case with directions to the juvenile court to ensure full compliance with the ICWA.

## DISPOSITION

The order terminating mother's parental rights to F.M. and H.M., the order appointing legal guardians for A.M., and the order terminating father's parental rights to H.M. are conditionally reversed. The matter is remanded to the juvenile court for the limited purpose of ensuring the Department's compliance with the ICWA. If after such compliance, the juvenile court determines that the children do not have Indian heritage, then the juvenile court shall reinstate the orders terminating mother's and father's parental rights and the guardianship order and may proceed accordingly.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.




MOSK, J.


We concur:



TURNER, P. J.



GOODMAN, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.